THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**NEWRAYS ONE LLC**                                                                                 **PLAINTIFF**

v.                                    Case No.: 4:24-CV-00824-LPR

**FAULKNER COUNTY, ARKANSAS;**                                                    **DEFENDANTS**
**ALLEN DODSON, in his official capacity**
**as Faulkner County Judge; TIM RYALS,**
**in his official capacity as Faulkner County**
**Sheriff; CAROL CREWS, in her official**
**capacity as Faulkner County Prosecuting**
**Attorney; PHIL MURPHY, in his official**
**capacity as Faulkner County Attorney**

# ORDER

Pending before the Court is a Motion for Preliminary Injunction filed by Plaintiff NewRays One, LLC.[1] At the request of NewRays, the Court has handled this Motion on an *extremely* expedited schedule. The Complaint and Motion were filed on Thursday, September 26, 2024. One Defendant was served on Friday, September 27, 2024. Most Defendants were served on Monday, September 30, 2024. The last Defendant was served by Tuesday, October 1, 2024. The Court directed Defendants to respond to the Preliminary Injunction Motion by 5:00 p.m. on Thursday, October 3, 2024. The Court set a Preliminary Injunction hearing for 3:00 p.m. on Friday, October 4, 2024. The Preliminary Injunction hearing lasted approximately six hours. Because NewRays believes it needs temporary relief before 8:30 a.m. on Monday, October 7, 2024, the Court agreed to rule on the Preliminary Injunction Motion by the end of the day on Sunday, October 6, 2024.

All this is to say that the following Order will not look like one of this Court's usual orders. For example, the Court typically likes to lay out the relevant facts in such a way that members of

---

[1] *See* Pl.'s Mot. for Prelim. Inj. (Doc. 3).

the public can get a good understanding of the case.  That is not possible here given the time constraints.  Instead, the Court will assume familiarity with the fairly voluminous record and will weave its factual determinations into its legal analysis.  For another example, the Court typically supports its factual findings with detailed and heavy footnotes to the record.  But, again considering the time constraints here, the Court will only do so with respect to factual findings that are (1) seriously disputed and (2) highly relevant to its legal analysis.  The Court regrets having to make these concessions to expediency, but it is the only way to resolve this Motion on the needed time horizon.[2]

The extremely expedited nature of this Motion also counsels the Court to strongly remind the parties and the public that the factual and legal calls the Court makes in this Preliminary Injunction Order are truly *preliminary*.  This is most important to understand when the Court addresses NewRays's likelihood of success on any particular claim.  With limited time for research and reflection, and with a record that is far less than fully developed by the parties, the Court must quickly make an educated guess as to how it will ultimately decide disputed—often complex—factual and legal issues in the case at bar.  The Court's tentative rulings below should not be confused with cemented determinations on any issue.

---

[2] Prior to the Preliminary Injunction hearing, the parties jointly suggested that the Court enter a 14-day Temporary Restraining Order and reset the briefing schedule and hearing date.  The Court would have liked to do that.  But the Court believed it lacked the authority to do so.  Defendants were not conceding that temporary relief of any kind was justified under the *Dataphase* factors.  Instead, they wanted to accept a Temporary Restraining Order simply to buy themselves more time to brief and argue the Preliminary Injunction Motion.  Under such circumstances, and without concluding that the *Dataphase* factors justify temporary relief, it would be inappropriate for a federal court to enjoin the operation or enforcement of a duly enacted law of a political subdivision of a state.

## ANALYSIS

When analyzing a preliminary injunction motion, federal courts use a four-factor test. In the Eighth Circuit, this is known as the *Dataphase* (or, more recently, the *Winter/Dataphase*) test.[3] A plaintiff seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest . . . ."[4] NewRays has argued that it deserves preliminary relief with respect to six of its claims. The Court will examine each claim using the foregoing test.

### I.     The First Amendment Retaliation Claim

Based on the record as it stands today, there is almost no chance that NewRays will succeed on its First Amendment retaliation claim. This claim focuses not on Ordinance 23-20, but rather on the actions taken in state court during an attempt to enforce the Ordinance. NewRays contends that its attempt to remove the enforcement action against it to federal court—a protected activity for purposes of the First Amendment—motivated Defendants to then expand the enforcement action to include individuals associated with NewRays (as opposed to just NewRays itself).[5] The problem for NewRays is that the record, including testimony at the Preliminary Injunction hearing, makes crystal clear that none of the Defendants sought to expand the enforcement action to include

---

[3] *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

[4] *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Because the preliminary relief sought here would enjoin—either facially or as applied—a duly enacted law of a political subdivision of a state, the Eighth Circuit's decision in *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds* teaches that the probability-of-success-on-the-merits factor only cuts in favor of NewRays if NewRays shows it is more likely than not to prevail on a particular claim. 530 F.3d 724, 731-32 (8th Cir. 2008). Under such circumstances, whether a plaintiff is more likely than not to prevail on the merits of a particular claim is a threshold determination. *Id*. at 732. The upshot is that, even if the other three factors weigh heavily in favor of the plaintiff, the plaintiff *still* cannot justify preliminary relief if it cannot show that it is more likely than not to prevail on the merits of any particular claim.

[5] *See* Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 4), 11-12.

3

individuals associated with NewRays.[6] It appears the expansion was done *sua sponte* by the judge in that enforcement action. That judge is not a defendant here. None of the Defendants in this case have retaliated against NewRays for its attempt to remove the enforcement action.

As NewRays agrees, "the most significant" factor in the preliminary injunction analysis "is likelihood of success on the merits."[7] In situations like this one—where the likelihood of success approaches zero—it is nearly impossible to imagine a scenario where preliminary relief would be justified by reference to the other three factors. Even if such a scenario is theoretically possible, there is nothing on this record that suggests the irreparable harm, the balance of harms, and the public interest tilt so definitively in NewRays's direction that those factors can overcome the extremely low likelihood of success on the merits.

## II.   The Preemption Claim

NewRays argues that "Ordinance 23-20's provisions that purport to criminalize conduct violate Ark. Code Ann. § 14-20-101(a)."[8] But that argument is based on a misreading of Ark. Code Ann. § 14-20-101(a). Some (very) brief background is in order here.

Section 1 of Amendment 55 of the Arkansas Constitution provides that "[a] county acting through its Quorum Court may exercise local legislative authority not denied by the Constitution or by law."[9] The Court understands this to mean that, if (1) state law doesn't prohibit the Ordinance

---

[6] This is evident from the testimony of Mr. Jacob Webb, the former prosecutor on the state enforcement action. The Court found Mr. Webb's testimony on this point highly credible and consistent with the rest of the record.

[7] Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 4) at 3 (citing *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)).

[8] *Id.* at 12. The Court's preemption analysis focuses only on the Ordinance's criminal provisions. The Ordinance has a severability clause that, it appears, would hold up under Arkansas law. *See generally Union Pac. R.R. Co. v. Franklin*, 2024 Ark. 74, 687 S.W.3d 787 (Ark. 2024). Accordingly, NewRays's preemption claim is really limited to the criminal provisions of the Ordinance.

[9] Ark. Code. Ann. § 14-14-801(a) puts an even finer point on things: "[A] county government, acting through its county quorum court, may exercise local legislative authority not *expressly* prohibited by the Arkansas Constitution or by law for the affairs of the county." (emphasis added).

and (2) the Ordinance falls within the common meaning of "legislative authority," the Ordinance is lawful. Given this background understanding of a County's authority, Ark. Code Ann. § 14-20-101(a) does not prohibit the criminal provisions of Ordinance 23-20. Here's why.

Ark. Code Ann. § 14-20-101(a) provides that "[a] county is authorized to prohibit and punish any act, matter, or thing which the laws of this state make a misdemeanor and to prescribe penalties for all offenses in violation of any ordinance of the county not greater than nor less than the penalties prescribed for similar offenses against the laws of this state." Ark. Code Ann. § 14-20-101(b) goes on to say that "[u]pon conviction of any person under such ordinance by any court, the conviction shall operate as a bar to further prosecution in any of the courts of this state for the same offense." In the Court's view, Ark. Code Ann. § 14-20-101 is essentially an anti-preemption statute. What the provision is doing is confirming that, even though a state law makes certain conduct a misdemeanor, the County may also do so without running afoul of any type of preemption.[10] But the provision understandably restricts the County, in that situation, to mirroring the criminal punishment provided by state law. Read in this way, and considering the default authority given to the County by the Arkansas Constitution, Ark. Code Ann. § 14-20-101(a) does not prevent a County from enacting an ordinance that declares certain conduct to be a criminal violation just because the State does not criminalize the same conduct.[11]

A separate statute would seem to confirm the Court's understanding. Ark. Code Ann. § 14-14-801(b) provides a non-exhaustive list of examples of local legislative authority possessed by counties. This list includes "the power to . . . [p]reserve peace and order and secure freedom from

---

[10] The reason Ark. Code Ann. § 14-20-101 does not speak of felonies is because the Arkansas Constitution prohibits a County from declaring any act a felony. Ark. Const. amend. 55, § 1(b).

[11] The Ordinance tried to make the conduct at issue a misdemeanor. *See* Faulkner Cnty. Ordinance 23-20, art. 6, § 1. But Ark. Code Ann. § 5-1-108(b) suggests that, by operation of law, the Ordinance actually made the conduct a criminal violation.

dangerous or noxious activities." The statute caveats that power, however, by providing that "no act may be declared a felony."[12] In the Court's view, an ordinance limiting noise pollution falls directly within this power. Moreover, the no-felony prohibition in Ark. Code Ann. § 14-14-801(b)(3) suggests that, without such language, a County would be free to make such conduct a felony. This, in turn, suggests that Ark. Code Ann. § 14-20-101 cannot be the broad limitation on county legislative power that NewRays believes it to be. Only under the Court's more narrow reading of Ark. Code Ann. § 14-20-101 does the no-felony portion of Ark. Code Ann. § 14-14-801(b)(3) avoid surplusage problems.

The bottom line is that NewRays, once again, has a low likelihood of success on the merits. To be clear, that likelihood is not as low as the likelihood that NewRays will succeed on the merits of its First Amendment retaliation claim. There is always a chance that, with more research by the parties and the Court, a different legal analysis will prevail regarding NewRays's preemption claim. At this point, however, the Court is confident in its interpretation of the Arkansas Constitution and the relevant state statutes. Simply put, NewRays is a far cry away from showing it is likely to prevail on its preemption claim.

So, "the most significant factor" cuts significantly against NewRays on this claim. Indeed, as the Court discussed in footnote 4, because NewRays is seeking to enjoin an ordinance, failure to show that it is more likely than not to prevail on the merits ends the entire preliminary injunction analysis. But even if it didn't, NewRays wouldn't get preliminary relief. NewRays is facing a criminal enforcement action that carries the threat of (at most) a $1,000 fine. If NewRays were to be fined, the fine would constitute irreparable harm because NewRays could not get that money back. This is irreparable harm, but it is minimal. NewRays suggests that there is potentially much

---

[12] Ark. Code Ann. § 14-14-801(b)(3).

greater irreparable harm at issue in the form of a potential injunction against its continued operations, the consequent loss of customer goodwill, and the consequent loss of significant revenue.  But even putting aside the question of the likelihood of these other more serious potential harms, they should not be considered for the preemption claim.  That is because the success of the preemption claim would only lead to the enjoining of the criminal provisions of the Ordinance.[13]  The Ordinance's civil provisions would still be alive and could be used to prevent continued operation of the NewRays facility.

The balance of harms is a wash.  A $1,000 dollar fine for a company earning as much as NewRays does in annual revenue from the facility in question is, in the grand scheme of things, not significant.  Not allowing a County to enforce parts of its duly enacted law is inherently harmful to the County, although that harm is mitigated here because the civil portions of the Ordinance would still be viable.  With respect to the harms at issue in this preemption claim, the stakes are low on both sides.  The same basic analysis is also true of the public interest factor.  Putting all the factors together, NewRays has not done enough to justify preliminary relief on its preemption claim.

### III. The Contract Clause Claim

The United States Constitution prohibits a State from passing a "Law impairing the Obligation of Contracts."[14]  NewRays says that it has several contracts "that pre-existed Ordinance 23-20," and that these contracts "have been substantially impaired by threatened enforcement of Ordinance 23-20."[15]  NewRays also says that "Defendants lack any authorization to criminalize conduct that is otherwise lawful under Arkansas law," and so "there is no significant and legitimate

---

[13] *See supra* note 8.

[14] U.S. Const. art. I, § 10, cl. 1.

[15] Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 4), *supra* note 5 at 11.

public purpose for [the County] to attempt to criminalize conduct under Ordinance 23-20 . . . ."[16] According to NewRays, this "renders Ordinance 23-20 unconstitutional under the Contract Clause."[17] There are myriad, independent problems with this claim.

First, the Court has already explained in Section II that the County does not lack the authorization to criminalize the conduct at issue. Consequently, and almost self-evidently, there is a significant and legitimate public purpose in creating a criminal noise ordinance.

Second, it is unclear why NewRays believes Ordinance 23-20 is interfering with its contracts. The Ordinance does not alter any terms or conditions of any contract. It does not render anything in the contract illegal or against public policy. Instead, the Ordinance requires the NewRays facility to stay below certain decibel levels. And a NewRays representative testified at the Preliminary Injunction hearing that the facility could do so (and has been doing so for some time). NewRays has not suggested that staying below this decibel level has interfered with its ability to perform its contractual obligations.[18] There is no evidence that any contract is about to be terminated or otherwise impaired, let alone evidence that such termination or impairment is related to Ordinance 23-20.

Third, to the extent NewRays is suggesting that it is the enforcement of the Ordinance—as opposed to the Ordinance itself—that is impairing or could impair its contracts, precedent suggests that such an argument will not prevail. Historically, the Contract Clause has been interpreted to apply to legislative action alone.[19] And upon reading the text of the Clause, any layman can

---

[16] *Id.*

[17] *Id.*

[18] The same is true of the more amorphous Ordinance section allowing a violation of the Ordinance to found based on a totality of five factors even if the stated decibel threshold is not pierced.

[19] *See Ross v. Oregon*, 227 U.S. 150, 160-62 (1913) (citations omitted) (illustrating in great detail the long and consistent history of Supreme Court decisions limiting application of the Contract Clause to legislative action).

immediately understand why this is so.  "No State . . . shall pass any Bill of Attainder, *ex post facto* Law, or Law impairing the Obligation of Contracts."[20]  The text is plain as can be: the Contract Clause applies to the passage of laws, a quintessentially legislative act.  The Clause does not reach executive enforcement, which is what NewRays is really challenging here as the thing purportedly impairing its contracts.

Like the preemption claim, the Court believes that NewRays's chance of prevailing on the merits of the Contract Clause claim is approaching zero.  Accordingly, and without belaboring the point, the Court will simply note that there is nothing on the record that suggests the irreparable harm, the balance of harms, and the public interest tilt so definitively in NewRays's direction that those factors can overcome the extremely low likelihood of success on the merits.

### IV.     The Procedural Due Process Claim

To be plain about it, NewRays's Due Process claim has befuddled the Court.  The claim appears to have something to do with a civil case pending against NewRays here in federal court.[21]  In that case, which is here because NewRays removed it from state court, several private individuals brought common law claims against NewRays based on the noise emanating from its facility.  NewRays says that the (potential) state court criminal proceeding "will trigger an injury to NewRays' procedural due process rights" in the civil case.[22]  NewRays never comes out and says what that injury will be.[23]  The closest NewRays gets is telling the Court that: (1) "NewRays has a protectable federal right to federal adjudication of contested questions of law and fact in the

---

[20] U.S. Const. art. I, § 10, cl. 1.

[21] That case, currently pending in the U.S. District Court for the Eastern District of Arkansas (Central Division), is *Anderson v. NewRays One, LLC*, E.D. Ark. Case No. 4:23-CV-685-LPR-ERE.  In its briefing, NewRays refers to this case as "*Anderson*" or "the *Anderson* case."

[22] Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 4), *supra* note 5 at 9.

[23] *See id.* at 9-11.

*Anderson* case, with concomitant procedural safeguards such as the rights to plead offensive and defensive claims and civil discovery[;]" and (2) "[t]he violation of NewRays' procedural due process rights arises from the state court proceeding's collateral effects *within* the" civil case in federal court.[24]

It seems that NewRays is being intentionally cagey in how it describes the asserted injury here. Perhaps that's good lawyering. The Court suspects that the intent is to avoid making an argument that would eventually boomerang on NewRays in the federal case if the state criminal enforcement action went forward. Whatever the motivation, the vague argument here leaves the Court unable to conclude that NewRays has any chance of success on the merits of this claim. That's especially true given the seemingly disparate issues at play in the federal case compared to the state enforcement action. As far as the Court can tell, the state enforcement action is about the decibel levels emitted from the NewRays facility as measured on one specific day and the requirements of Ordinance 23-20. The federal court action is far more general, predicated primarily on common law principles (as opposed to Ordinance 23-20), and focused on the cumulative effect of the decibel levels emitted from the NewRays facility over weeks, months, and years.

For the same reason, the Court is unable to conclude that NewRays is facing a likelihood of irreparable harm with respect to this claim. The injury asserted is undefined enough that the Court can't figure out what it really is. Again, perhaps that's a strategic lawyering decision. But the consequence is that NewRays can't show a likelihood of irreparable harm or that the balance of harms and the public interest cut so significantly in its favor that they outweigh the very low likelihood of success on the merits.

---

[24] *Id.* at 9-10 (emphasis in original).

## V. The Equal Protection Claim

The Equal Protection claim is divided into two arguments. First, NewRays argues that the criminal provisions of Ordinance 23-20 (and only the criminal provisions) violate equal protection principles because they fail rational basis review.[25] For this point, NewRays exclusively relies on the argument that the County "lacks **any** governmental interest [in] criminaliz[ing] the conduct regulated by Ordinance 23-20."[26] In turn, this argument exclusively relies on NewRays's proposition—explained in Section II above—that Arkansas state law prohibits the County from criminalizing this conduct. The problem for NewRays is that—as also explained in Section II above—the Court disagrees with the proposition that Arkansas state law prohibits the County from criminalizing the conduct at issue. Accordingly, the County has a legitimate interest in criminalizing the conduct at issue. And that is enough to reject NewRays' rational-basis argument to the contrary.[27]

The second part of NewRays' Equal Protection Clause argument is more serious. NewRays argues that the entire Ordinance violates the Equal Protection Clause because (1) its enactment was in part motivated by anti-Chinese sentiment, (2) the Ordinance is not justified by a compelling government interest, and (3) the Ordinance is not narrowly tailored to achieve a compelling government interest (assuming one existed).[28] The hotly contested question here is whether the enactment was in part motivated by anti-Chinese sentiment.[29]

---

[25] *Id.* at 4, 6-7.

[26] *Id.* at 4 (emphasis in original).

[27] In its briefing, NewRays failed to make the alternative argument that the criminal provisions of Ordinance 23-20—or the civil provisions—were not rationally related to a legitimate government interest (assuming *arguendo* that one existed). The Court therefore does not address the second part of the rational-basis analysis.

[28] *Id.* at 4-6.

[29] All parties discuss the purported anti-Chinese sentiment in this case as an alienage issue, not a racial one. For our purposes, however, it does not matter; both race and alienage classifications would trigger strict scrutiny.

Everyone in this case agrees that Ordinance 23-20 does not facially discriminate by race or alienage. "A facially neutral law . . . warrants strict scrutiny only if it can be proved that the law was motivated by a racial [or alienage-based] purpose or object, or if it is unexplainable on grounds other than race [or alienage]."[30] On the evidentiary record in front of the Court, Ordinance 23-20 is certainly not "unexplainable on grounds other than" race or alienage. The record is replete with references to serious noise problems from the NewRays facility and with references to Ordinance 23-20 being drafted and enacted to stem those specific noise problems. In short, there are plausible explanations for the Ordinance—even given its narrow and targeted scope—that do not involve race or alienage. So the (perhaps) most important question for purposes of this preliminary injunction analysis comes down to whether NewRays has shown that it is more likely than not that, at trial after full discovery, NewRays would be able to prove by a preponderance of the evidence that Ordinance 23-20 was motivated (at least in part) by a discriminatory (be it racial discrimination or alienage-based discrimination) purpose or object.

NewRays One, LLC has one member.[31] That member is another LLC (Compute West, LLC), whose sole member is Steven Li.[32] Mr. Li is a United States citizen who was born in China. There is no question that, prior to the adoption of Ordinance 23-20, some Faulkner County residents (including Judge Dodson) believed NewRays One, LLC, to be a foreign-owned company. But was invidious race or alienage discrimination a "motivating factor in the decision" to enact Ordinance 23-20?[33]

---

[30] *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (internal citations and quotations omitted).

[31] Compl. (Doc. 1), ¶ 7.

[32] *Id.*

[33] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). In *Village of Arlington Heights*, the Supreme Court made clear that discriminatory purpose need not be the sole factor, the dominant factor, or the primary factor to trigger strict scrutiny. *Id.* Rather, a discriminatory purpose triggers strict scrutiny even if it is simply one of many factors motivating the enactment of a law. *Id.*

Inquiry into the motivations of a legislative body like the Quorum Court "is an inherently complex endeavor" requiring a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[34] One potential piece of evidence courts often consult is whether "[t]he impact of the official action . . . 'bears more heavily on one race [or alienage] than another.'"[35] In our case, however, this part of the inquiry does not reveal much. The NewRays facility is the only cryptocurrency mining facility in the Faulkner County jurisdiction. If there were more such facilities—for example, some purportedly owned by Chinese interests and some exclusively owned by Arkansans—the Court could determine whether only the purportedly Chinese cryptocurrency mining companies were being targeted by the Ordinance itself or by selective enforcement of the Ordinance. It is true that the Ordinance is narrowly targeted at cryptocurrency mining facilities and that the only cryptocurrency mining facility subject to the jurisdiction of Faulkner County is the NewRays facility. But, as explained above, there are legitimate non-racial and non-alienage-based explanations for why that is so. In this context, the impact analysis does not get NewRays to strict scrutiny. It doesn't move the ball forward much at all for NewRays.

In cases like this, where the foregoing inquiries don't provide a ready answer, courts should consider things like (1) "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes," (2) "[t]he specific sequence of events leading up to the challenged decision," and (3) "legislative or administrative history . . . , especially where there are contemporary statements by members of the decisionmaking body, minutes of its

---

[34] *Hunt*, 526 U.S. at 546 (quoting *Vill. of Arlington Heights*, 429 U.S. at 266).

[35] *Vill. of Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis,* 426 U.S. 229, 242 (1976)).

meetings, or reports."[36] The Supreme Court has noted that this last source of evidence "may be highly relevant."[37]

Over the last 48 hours, the Court has pored over the entire record, including the voluminous exhibits. The Court has paid particular attention to: (1) the transcripts of the Public Safety Committee of the Faulkner County Quorum Court, the full Faulkner County Quorum Court, and a state legislative hearing attended by Judge Dodson, County Attorney Phil Murphy, and County Administrator Randy Higgins; (2) the emails sent to two members of the Quorum Court by Secure Arkansas and Conduit for Action; (3) the message that Samantha Smith sent to Governor Sarah Huckabee Sanders, and (4) Mr. Cavin's Facebook post. In addition to scouring the evidentiary record, the Court heard hours of testimony (during the Preliminary Injunction hearing) concerning the Quorum Court meetings and meetings between County residents and County officials of various stripes.

There is no direct evidence in this record that race-based or alienage-based discrimination motivated (in whole or part) any member of the Quorum Court or any County official. There is, however, some weak circumstantial evidence of such discriminatory motivation or purpose. First, two Justices of the Peace appeared to have been receiving anti-Chinese newsletters (concerning, among other things, cryptocurrency mining) in the time period leading up to the passage of the Ordinance.[38] Second, Mr. Cavin expressed—in a crude fashion—anti-Chinese sentiment when discussing the NewRays facility and Ordinance 23-20 in a Facebook post.[39] This is relevant because Mr. Cavin may have met with County officials (including Judge Dodson) around the time

---

[36] *Id.* at 267-68 (internal citations omitted).

[37] *Id.* at 268.

[38] *See generally* Pl.'s Ex. 52.

[39] *See* Pl.'s Ex. 55.

the Ordinance was passed.  And Mr. Cavin certainly met with County officials after the enactment of the Ordinance (on behalf of Gladys Anderson).[40]  Third, when, at a state legislative hearing, Judge Dodson was asked whether NewRays was an American or foreign company, he responded that his "understanding is that it's foreign" and that "our county attorney spent some time trying to run up through the nested holding companies and traced it certainly out of state and I think potentially out of country."[41]

This is really all there is for NewRays.[42]  The transcripts of the subcommittee meeting and the Quorum Court meetings uniformly show all the participants focused intently on addressing the noise concerns created by the NewRays facility.  There are almost no references to Chinese ownership, and certainly none by the Justices of the Peace themselves.  The Justices of the Peace that were less supportive of the Ordinance never suggested their colleagues had any race-based or alienage-based discriminatory motivations.  And although a few stray references could be contorted to try to tease out some implication of alienage discrimination, that is not the best way to read the record.

In the Court's view, the evidence shows no more than a faint whiff of discriminatory purpose.  The fact that some members of the Quorum Court knew that some members of the public were fixated on the purportedly foreign ownership of NewRays is not enough, on its own, to ascribe that same motivation (even in part) to members of the Quorum Court.  That is especially

---

[40] *See* Pl.'s Ex. 49.

[41] *See* Pl.'s Ex. 56, 52.

[42] At the Preliminary Injunction hearing, Mr. Li testified briefly about a purported anti-Chinese slur being used against one of his employees at a Quorum Court (or subcommittee) meeting.  Mr. Li was not at the meeting.  His employee told him what allegedly happened sometime later.  This is hearsay and the Court will not consider it.  In any event, Mr. Li did not suggest the slur was made by a Quorum Court member or even during the meeting itself.  For all Mr. Li knows, the awful comment could have been made by a random member of the public before or after the meeting outside the earshot of any other person.

true when other members of the public were solely focused on the noise problems, and the contemporaneous evidence suggests that the Quorum Court shared that focus.  Certainly, discovery may reveal facts that alter this analysis.  But, for now, NewRays has not shown that it is more likely than not that it can prove a discriminatory purpose motivated (at least in part) the passage of Ordinance 23-20.  Correspondingly, NewRays has not shown that it is more likely than not that it will prevail on its Equal Protection claim.[43]  And, again as discussed in footnote 4, that, on its own, ends the preliminary injunction analysis.

The Court has already acknowledged that NewRays is facing a $1,000 fine.  That's irreparable harm.  But it is minimal, as discussed in Section II.  And as for the other much greater irreparable harms that New Rays alleges—that is, a potential injunction against its continued operations, the loss of consumer goodwill, and the consequent loss of significant revenue—those harms are not likely.  At the Preliminary Injunction hearing, Mr. Li testified that NewRays can keep its noise emission under the Ordinance's decibel thresholds.  If that is the case, further violations of the Ordinance by NewRays are unlikely.  Correspondingly, continuing-violation fines or abatement/injunction orders against NewRays are also unlikely.[44]  In light of the foregoing, both the balancing of harms and public interest factors cut in favor of Defendants.  A County is entitled to help its citizens by keeping noise in check.  The public interest in such protection is fairly high.  If the Court were to enjoin Ordinance 23-20, it would prevent the County from protecting some of

---

[43] NewRays is closer to a likelihood of success on the merits with this claim than it is for any of the claims previously discussed in this Order.  Although these guesses can't really be reduced to numerical probabilities, the Court is comfortable ballparking NewRays's chance of success on this claim at around 30%.  There are certainly grayish particles nested throughout the record.  But, taken as a whole, the record suggests those grayish particles are fog, not smoke.  And the Court has certainly not seen, heard, or smelled any fire.

[44] It is true that the Ordinance allows for the finding of a noise violation even if a facility's noise emissions do not pierce the 55 dBa/60 dBa thresholds.  But the lack of evidence in the record of any potential or threatened enforcement under this more amorphous provision, combined with the noise mitigation efforts made by NewRays, makes an injunction/abatement under this provision highly unlikely.

its citizens from noise pollution. Ultimately, the balance of all four factors weighs against a preliminary injunction.

## VI. The Takings Claim

It is a little unclear what the heart of NewRays's takings claim is supposed to be. On one hand, NewRays appears to be (in its opening paragraph of the relevant section of its brief) attacking the Ordinance itself as an unconstitutional taking without just compensation.[45] On the other hand, NewRays subsequently focuses its attack on the specific effort in state court to enforce this Ordinance.[46] Either way, or both ways, NewRays cannot show it is more likely than not that it will prevail on the merits of the takings claim.

Let's start with the Ordinance itself. NewRays does not argue that the decibel levels constitute a regulatory taking. Instead, it argues that "[t]he clear and unambiguous purpose of Ordinance 23-20 was to shut down NewRays' business operations by any available means, whether through an injunction, an order of abatement, or contempt powers."[47] Even assuming (and this is quite an assumption) that a takings claim could look past the face of an Ordinance to its purpose, NewRays's problem is that the Court reads the record very differently.

NewRays has ripped out of context a few phrases from meetings of the Quorum Court and its subcommittees.[48] Read in the full context of these meetings, and in the full context of the entire record, it is clear to the Court (at least on the record as it stands today) that the purpose of the Ordinance was to reduce the noise being emitted from the NewRays facility to a level below the decibel thresholds specified in the Ordinance. It is true that the Ordinance provides a method by

---

[45] *See* Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 4), *supra* note 5, 7-8.

[46] *Id.* at 8-9.

[47] *Id.* at 8.

[48] *See id.*

which the facility could be shut down if the facility does not or cannot reduce its noise emissions. But the evidence does not suggest that this Ordinance is just a ruse to shut down the facility even if the facility can meet the noise restrictions.[49]  In short, the Ordinance does not prevent NewRays from operating its business on the property at issue.  This is not a classic (or complete) taking.

Although NewRays did not make the argument, the Court notes that, in theory, the Ordinance could still constitute a regulatory taking if the decibel level threshold (or the more amorphous totality of the circumstances test) in the Ordinance prevented the facility's operation, reduced the facility's operational capacity, or required the facility to expend significant moneys for mitigation efforts.[50]  But NewRays has not shown that, under the *Penn Central* test, the Ordinance would constitute a taking.[51]  NewRays has not shown a diminution in value of its business or a diminution in potential earnings associated with staying under the decibel levels in the Ordinance.  NewRays has not shown an interference with investment-backed expectations associated with staying under the decibel levels in the Ordinance.  And the character of the governmental action here is far closer to an exercise of the police power than an exercise of the eminent domain power.[52]

All this leaves NewRays with one final argument: that the potential state enforcement action is a taking.  But, unless there are continued violations of the Ordinance by NewRays, that

---

[49] As noted in Section V, there is evidence from NewRays itself that NewRays can and will meet the noise restrictions.

[50] The spend-significant-moneys theory may be more akin to the exaction cases.  *See generally Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994).  To the extent this is right, there is a reasonable relationship between NewRays's use of the property (as a data center that mines cryptocurrency, a very noisy activity) and the noise emission regulation in Ordinance 23-20.

[51] *See Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124-25 (1978).

[52] *Compare United States v. Carmack*, 329 U.S. 230, 238-41 (1946) (Takings Clause implicated when the government exercises its powers of eminent domain), *with Lucas v. S.C. Coastal Comm'n*, 505 U.S. 1003, 1029-30 (1992) (Takings Clause not implicated when a state uses its general police powers to bar a landowner from use that would constitute a common-law nuisance).

state criminal enforcement action can result in nothing more than a $1,000 fine. And, given Mr. Li's testimony, it is unlikely that NewRays will violate the Ordinance again (even assuming it violated the Ordinance on the one day it is alleged to have done so). The Court understands NewRays's fear that the state court judge will act in some way that exceeds his authority. But the Court cannot assume the state court judge will intentionally take future, bad-faith actions inconsistent with the law. In short, the criminal enforcement action here is not a taking of anything, but rather an exercise of police powers to deter future violations of the noise Ordinance—at least, that's the most logical read of the record in front of the Court.

From what has been said thus far, it should be clear that the Court believes NewRays has very little chance of success on its takings claim. Accordingly, as explained in footnote 4, the Court would not grant a Preliminary Injunction even if the other factors cut fairly heavily in favor of NewRays. As the Court has also explained, those factors don't cut in favor of NewRays anyway. In short, a Preliminary Injunction is not justified here.

## CONCLUSION

For the reasons set out above, the Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED this 6th day of October 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE